IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

|  |  |  |
|---|---|---|
| LINDA VALLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | CIVIL NO. 3:11-cv-260-HEH |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Linda Valley ("Plaintiff") previously worked as a telephone operator, receptionist, secretary and bookkeeper. She alleges that she suffers from Multiple Sclerosis ("MS"), depression and degenerative disc disease. On February 7, 2008, Plaintiff applied for Social Security Disability ("DIB") under the Social Security Act (the "Act"). Later, she amended her onset date to January 26, 2007. Administrative Law Judge Drew A. Swank ("the ALJ") conducted a hearing on Plaintiff's claim on October 2, 2009, and then issued an opinion denying Plaintiff's request for DIB benefits on November 9, 2009.

Plaintiff challenges the ALJ's denial of DIB benefits, asserting that the ALJ did not apply the proper legal standard when weighing her treating physician's opinion and evaluating her credibility. In his decision, the ALJ found that Plaintiff maintained the residual functional capacity ("RFC") to perform her past relevant work as a telephone operator. (R. at 19.) In doing so, the ALJ rejected the opinion of Plaintiff's treating physician, because it was inconsistent with the physician's treatment notes and the medical evidence. (R. at 18.)

Plaintiff also alleges that the ALJ erred, because he failed to adequately explain his decision. (*See* Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") at 13-24.) In his decision, the ALJ did not address the import of medical evidence describing Plaintiff's deteriorating condition. Essentially, the ALJ failed to recognize and discuss the evidence in the record that showed a deterioration of Plaintiff's disease after July 2008. Had the ALJ addressed this key issue, he might have determined an effective onset date for Plaintiff's disability.

After reviewing the record and pleadings in this case, the Court *sua sponte* ordered oral argument that occurred on June 8, 2012; included on that oral argument docket was another case handled by ALJ Swank: *Loving v. Astrue*, No. 3:11-cv-411-HEH. The Court ordered oral argument after seeing a pattern of problems with ALJ Swank's decisions. During this calendar year alone, five cases handled by ALJ Swank have been remanded either as a result of the agreement of the parties or based on this Court's Report and Recommendation.[1] And these five cases only encompass appeals of ALJ Swank's decisions filed in the Richmond Division of this Court.

Today, we add two more cases to the list of reversals of ALJ Swank's opinions. Along with this Report and Recommendation, the Court also recommends that *Loving v. Astrue*, No. 3:11-cv-411-HEH, be reversed. At oral argument, counsel for the Commissioner indicated that ALJ Swank has since transferred to Charlottesville and is now under the purview of the Western District of Virginia; however, a number of appeals of his opinions in other cases remain pending in this district. Consequently, at oral argument, the Court directed counsel for the Commissioner to engage in a full review of all ALJ Swank cases pending before the Court by July 9, 2012.

---

[1] The five cases are: *Williams v. Astrue*, No. 3:11-cv-208-JAG; *Turner v. Astrue*, No. 3:11-cv-275-JAG; *Proffit v. Astrue*, No. 3:11-cv-310-JRS; *Lyons v. Astrue*, No. 3:11-cv-495-HEH; and *McGuigan v. Astrue*, No. 3:12-cv-145-JAG.

2

Plaintiff seeks judicial review of the ALJ's decision in this Court pursuant to 42 U.S.C. § 405(g). The parties have submitted cross-motions for summary judgment, which are now ripe for review.[2] Having reviewed the parties' submissions and the entire record in this case, the Court is now prepared to issue a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons that follow, it is the Court's recommendation that Plaintiff's motion for summary judgment and motion to remand (ECF No. 7) be GRANTED; that Defendant's motion for summary judgment (ECF No. 9) be DENIED; and that the final decision of the Commissioner be REVERSED and REMANDED for a consideration of Plaintiff's effective onset date.[3]

## I. MEDICAL HISTORY

At issue in this case is whether Plaintiff's MS affects her life to the point that she is unable to return to work. Therefore, the opinion of Plaintiff's treating physician and Plaintiff's credibility are important in determining whether Plaintiff is disabled under the Act. As such, the Court will focus on Plaintiff's medical records, an opinion from John J. Hennessey IV, M.D. (Plaintiff's treating neurologist), the opinion of a non-treating physician, an opinion from Linda M. Dougherty, Ph.D, a consultative psychiatrist, Plaintiff's own testimony, and an opinion from Robert W. Lester, Plaintiff's vocational expert.

---

[2] The administrative record in this case has been filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

[3] At the oral argument, counsel for the Commissioner assured this Court that this case would not be assigned to ALJ Swank on remand, as he is now located in Charlottesville. For that reason alone this Court does not recommend that this case be assigned to another ALJ.

A.     **Plaintiff's Medical History**

Plaintiff is currently 62 years-old and was diagnosed with MS in 2004. (*See* R. at 462.)

In 2006, Plaintiff relocated from Massachusetts to Virginia to help her son's family while he was

terminally ill. (*See* R. at 342, 415.)

Plaintiff was observed in early 2007 with a foot drop of her right foot, which Andrew L.

Rose, M.D., believed to be related to her MS. (R. at 359, 362.) Plaintiff also complained of

right hip, right leg and right lower extremity pain with weakness in the right leg. (R. at 362.)

While she experienced similar episodes in the past, Plaintiff reported that she did not believe her

pain was related to the MS. (R. at 362.) Plaintiff began seeing a chiropractor to alleviate her

condition and believed that the chiropractor helped her gain strength back in her right leg. (R. at

359.) An MRI indicated that Plaintiff's brain was consistent with her disease process and her

lumbar spine had no significant bulging or disk issues. (R. at 395.)

In March 2007, Plaintiff began seeing Dr. Hennessey for her MS. (*See* R. at 415.) In a

letter from Dr. Hennessey to Dr. Rose, Dr. Hennessey detailed Plaintiff's symptoms of MS:

poor vision, fatigue, right hemibody weakness affecting her cognition and an MRI suggesting

demyelinating disease.[4] (R. at 415.) Plaintiff believed that she might have had symptoms of MS

since her twenties, as she had felt weak on the right side when she was pregnant and lost vision

in her right eye for several weeks. (R. at 416.) While being treated for MS in Massachusetts,

Plaintiff's doctor did not give her steroids or Avonex, but instead gave her Provigil for fatigue,

which Plaintiff felt overstimulated her. (R. at 415-16.) Dr. Hennessey commented that Plaintiff

was doing reasonably well with her MS, "although the exception would be toward the end of

---

[4] A demyelinating disease is one where there is a "destruction, removal, or loss of the
myelin sheath of a nerve or nerves." *Dorland's Illustrated Medical Dictionary* 486 (Ed. 32
2011). One type of demyelinating disease is MS. *See id.* at 1680.

January she had a relapse manifest as weakness in the R[ight] leg, which has been a contentious point for her from the very beginning." (R. at 416.)

Dr. Hennessey's neurological examination revealed reflexes of +2 or +3 above the waist, at the knees and at the ankles. (R. at 417.) He noted that Plaintiff's toes were "definitively upgoing bilaterally," "Hoffman's was positive in a subtle way for both hands," and that her right leg had a collapsing weakness. (R. at 417.) Plaintiff's gait was slow and she tended to walk with the right leg stiff. (R. at 417.) Finally, Dr. Hennessey diagnosed Plaintiff with demyelinating disease and suggested she take medication for her MS, because he was concerned with the pace that her disease was progressing and concerned "more for her at the hands of the disease than . . . with the side effects from the[] drugs." (R. at 418.)

In April 2007, Dr. Hennessey saw Plaintiff again. Dr. Hennessey noted that MRIs of Plaintiff's brain indicated that she "had established business with MS and [] also has had new business as demonstrated by the enhancing lesions in the bioccipital lobes." (R. at 413.) Dr. Hennessey discussed the different options for medication with Plaintiff and suggested that Plaintiff take steroids until she decided on a medication regimen for her MS. (*See* R. at 413.) He was very insistent that Plaintiff began immunotherapy as soon as possible. (*See* R. at 414.)

About a month later, Plaintiff agreed to begin Betaseron therapy.[5] (R. at 411.) Dr. Hennessey gave Plaintiff some samples of Provigil for her constant fatigue. (See R. at 411.) Plaintiff also indicated that for two weeks after her steroid treatment, she felt remarkably energized. (R. at 411.) Dr. Hennessey noted an element of collapsing weakness in Plaintiff's lower right extremity. (R. at 412.) He noted dulled sensibility below the chin to vibrations and

---

[5] Betaseron is a "trademark for a preparation of interferon beta-lb." *Dorland's* at 212. Beta-1b "has both antiviral and immunoregulatory properties and is used as a biologic response modifier in the treatment of relapsing forms of" MS. *Id.* at 948.

reflexes of +2 or +3 above the waist, at the knees and at the ankles. (R. at 412.) Dr. Hennessey also observed that Plaintiff's gait was slightly hesitant and stiff. (R. at 412.) Dr. Hennessey documented his impression as relapsing remitting MS. (R. at 412.)

In September 2007, Dr. Hennessey was impressed that Plaintiff was tolerating the Betaseron injections well and noted that she took Tylenol to ease the side effects. (R. at 409.) Dr. Hennessey indicated that Plaintiff had not taken any falls and carried around a cane "as an insurance policy." (R. at 409.) Because it made her anxious, Plaintiff took Provigil sparingly. (R. at 409.) Plaintiff had spells of urinary incontinence. (R. at 410.) Dr. Hennessey noted that Plaintiff's reflexes were +2 or +3 above the waist, at the knees, and at the ankles. (R. at 410.) He indicated that Plaintiff's gait was functional with a bit of stiffness. (R. at 410.) Dr. Hennessey's impression was again relapsing remitting MS. (R. at 410.)

In March 2008, Dr. Hennessey noted that Plaintiff was still tolerating the Betaseron well. (R. at 406.) Despite Dr. Hennessey's belief that Plaintiff had not changed "appreciatively" since he last saw her, Dr. Hennessey noticed that she ranked "a fair number" of her days as "worse than usual" and that she complained constantly about her balance. (R. at 406.) Dr. Hennessey encouraged Plaintiff to pursue exercise, including water aerobics, to challenge her body by balancing. (R. at 406.)

To enliven her energy level and fight her fatigue, Plaintiff was placed on coenzyme Q-10, which seemed to "pick her up." (R. at 407.) Dr. Hennessey also recommended that Plaintiff take Vitamin D for her fatigue. (R. at 407.) He noted that Plaintiff did not mention any new medical issues, but still complained of balance and her weakened and stiff right leg. (R. at 407.) Dr. Hennessey observed Plaintiff's reflexes at +2 or +3 at the knees and ankles; middle and moderate sensibility below the chin; and slow and cautious walking with a slight limp without a

6

cane. (R. at 407.) He also noted that Plaintiff was shakier on the right leg than on the left. (R. at 408.) Plaintiff was "more steady" than Dr. Hennessey would have imagined, with very minimal or subtle truncal sway. (R. at 408.) Dr. Hennessey's impression was again relapsing remitting MS. (R. at 408.)

In June 2008, Plaintiff told Dr. Hennessey that she "had an undeniable tendency toward facing difficulty with her MS," which he took to mean that Plaintiff was suffering from early morning stiffness and spasticity that took a while to overcome after waking. (R. at 403.) Plaintiff's right leg was still weaker than her left and her balance was aided with the use of a cane. (R. at 403.) Dr. Hennessey noted a May 2008 MRI of Plaintiff's brain that indicated extensive white matter lesions. (R. at 403.)

Dr. Hennessey documented Plaintiff's medication as including Betaseron, steroids and tizanidine. (R. at 403.) He wanted to refer Plaintiff to have an academic opinion, "given the momentum of her disease and the fact that her white matter changes [were] progressing despite the use of the highest dosed interferon." (R. at 404.) Dr. Hennessey observed that Plaintiff had a slow and cautious gait, walked stiffly and wide-based, tended to use touch contact and support with the wall and furniture, and performed better than expected when standing independently on one leg. (R. at 404.) Dr. Hennessey's impression was again relapsing remitting MS. (R. at 405.)

In July 2008, Dr. Hennessey noted that MRIs of Plaintiff's spine indicated cervical degenerative disease. (R. at 390.) Plaintiff complained of referred pain in the right shoulder and occasional numbness, but not much weakness. (R. at 391.) Dr. Hennessey observed that the May 2008 MRI included extensive white matter with several lesions, which indicated a progression in the MS despite treatment and Plaintiff's compliance. (R. at 391.)

7

Dr. Hennessey noted that the steroid treatment was a success, as Plaintiff was happy with her rate of improvement and looked "like a different patient with her performance on her feet and her balance" being better without her cane. (R. at 391.) Plaintiff was also "much more upbeat and less overtly depressed and anxious from the mid-June visit." (R. at 391.)

Plaintiff cautiously changed her posture, but she was in more control, walked without a cane and was more carefree with less stiffness than in June. (R. at 391.) Plaintiff was able to stand for seconds independently on each leg without support. Dr. Hennessey wrote: "I would not have believed it if I had not seen it with my own eyes." (R. at 392.) Dr. Hennessey's impression was again relapsing remitting MS. (R. at 392.)

On March 18, 2009, Plaintiff visited Dr. Hennessey. (R. at 483.) Plaintiff had recently met with Dr. Myla Goldman at the University of Virginia and she "was impressed by the fact that she has at least 30 years of MS behind her and she is still ambulatory and doing as well as she is." (R. at 483.) Dr. Hennessey noted extremity spasticity on Plaintiff's right side and Plaintiff's "upbeat" appearance. (R. at 483.) Dr. Hennessey indicated that Plaintiff's reflexes were at +2 or +3, motor functions in her upper extremities were at 5/5 and gait was taken cautiously. (R. at 483-84.)

Six months later, in September 2009, Dr. Hennessey again saw Plaintiff. (R. at 479.) He noted that Plaintiff had a favorable response to the steroids for only a few days and then became weak, tired and fatigued. (R. at 479.) Plaintiff was still taking Betaseron. (R. at 479.) Plaintiff was having problems with her gait and began to have fatigue and weakness in the left leg below the knees. (R. at 479.) Dr. Hennessey recommended her to physical therapy. (R. at 479.)

Dr. Hennessey noted that Plaintiff's reflexes were +2. (R. at 480.) He also observed dulled sensibility below the chin to vibrations in all four extremities, especially the right leg. (R.

8

at 480.) Plaintiff's did not need touch contact when walking without shoes, but her right leg indicated circumduction limping. (R. at 480.) Dr. Hennessey recognized Plaintiff's use of a cane inside and outside the home. (R. at 480.) His impression was again relapsing remitting MS. (R. at 480.)

**B.      The Opinion of Plaintiff's Treating Physician, Dr. Hennessey**

On October 24, 2008, Dr. Hennessey wrote a letter discussing Plaintiff's MS. (R. at 461.) Dr. Hennessey opined that, as a result of her MS, Plaintiff had chronic fatigue throughout the day; was weak; had difficulty getting up after bending over or getting on her knees; had difficulty keeping track of things, remembering things short-term, and multitasking; and was confused when placed under pressure. (R. at 461.) Dr. Hennessey also noted that Plaintiff's "neurogenic bladder [] will require further investigation." (R. at 461.) Because MS progresses with time, Dr. Hennessey anticipated Plaintiff's symptoms would progressively worsen. (R. at 461.) As a result, he "endorsed" Plaintiff's pursuit of disability, as he believed she could not perform sedentary jobs. (R. at 461.)

On September 18, 2009, Dr. Hennessey wrote an updated opinion letter to Plaintiff's counsel, noting that he was concerned with Plaintiff's ability to perform work and that Plaintiff's condition was "quite advanced" and "very likely" to continue to deteriorate. (R. at 474-75.) Dr. Hennessey summarized his treatment notes, which included: a January 26, 2007 MRI indicating a diagnosis of MS, Plaintiff's abnormal gait since January 2007 and weakness and spasticity in her lower right extremity since 2007. (R. at 474.) Despite her medication regimen of steroids and Betaseron, Plaintiff experienced "some significant breakthrough weakness" in her left leg that made it difficult for her to walk, stand and turn. (R. at 474.) Dr. Hennessey wrote that Plaintiff's "symptoms are likely to fluctuate from day to day," but they have persisted since

9

January 2007 and will only continue to progress as Plaintiff's MS is "quite advanced." (R. at 474.)

Because of Plaintiff's symptoms, Dr. Hennessey opined that he did not expect Plaintiff to be able to maintain working, as her issues with balance created a safety problem if she were to be on her feet all day. (R. at 475.) While Dr. Hennessey did not prescribe the cane that Plaintiff was using, he felt it was medically necessary, as it aided in her balance. (R. at 475.) Continuing, Dr. Hennessey opined that Plaintiff could not walk more than half a city block with her cane without needing rest. (R. at 475.)

Because of Plaintiff's level of fatigue and lack of focus and concentration, Dr. Hennessey opined that Plaintiff could not handle jobs with sustained physical or cognitive activities. (R. at 475.) Even if Plaintiff could take frequent breaks at work, Dr. Hennessey opined that Plaintiff could not "reconstitute her strength quickly enough to restart and sustain" work. (R. at 475.) Dr. Hennessey believed this would be the case even in a sedentary position. (R. at 475.) As a result of her fatigue, Dr. Hennessey opined that Plaintiff would miss three to four days of work a month. (R. at 475.)

While Dr. Hennessey noted that Plaintiff could follow upbeat, three-step commands, he dismissed those results as "quick baseline[s] of her cognitive functioning" and opined that, realistically, Plaintiff could not sustain cognitive functioning in a work environment. (R. at 475.) Dr. Hennessey concluded that Plaintiff was "a tough lady" who would work if "it was medically advisable." (R. at 475.)

## C.    The Non-treating Physician's Opinion

On September 5, 2008, J. Astruc, M.D. reviewed Plaintiff's medical records by request from the Commissioner. (R. at 421-22.) The non-treating physician whose specialty was

10

neurology, detailed that there was no clinical evidence of progressive disease, but that Plaintiff was taking steroids and Betaseron. (R. at 422.) Dr. Astruc wrote that her neurological exam indicated modest deficits. (R. at 422.) Finally, he opined that Plaintiff was capable of walking without assistance and retained "the RFC for sedentary work without any other restriction," because her cane was not necessary for ambulation. (R. at 422.)

**D.      The Opinion of Dr. Dougherty, the Consultative Psychiatrist**

On December 30, 2008, Plaintiff was examined by Linda M. Dougherty, Ph.D. (R. at 462.) Dr. Dougherty summarized Plaintiff's medical history and the tests that Plaintiff took. (R. at 462-68.) Dr. Dougherty diagnosed Plaintiff with Depressive Disorder NOS. (R. at 468.) Dr. Dougherty determined that Plaintiff did not have memory problems, would need supervision to manage her funds and could perform simple, repetitive tasks and moderately detailed, complex tasks. (R. at 469.)

Dr. Dougherty determined that Plaintiff "was a credible claimant." (R. at 468.) Based on her mental status, Dr. Dougherty concluded that Plaintiff could regularly attend and complete a normal workday, but might need additional supervision to complete work activities on a consistent basis. (R. at 469.) While Plaintiff would probably accept instructions from supervisors, she would probably experience increased levels of depression and anxiety to deal with the usual stresses encountered in a competitive workplace. (R. at 469.)

**E.      Plaintiff's Testimony**

In September 2008, Plaintiff completed a Function Report, indicating that her daily activities included: eating, resting, reading, performing light household chores, showering, dressing, watching television, checking on pets, doing dishes, dusting, calling people, using the computer, checking the mail and making dinner with her husband. (R. at 198-205.) Plaintiff

indicated problems with her legs and balance; an inability to use the bathtub (she could only shower); an inability to style her hair; and problems balancing, sitting down and getting up from the toilet. (R. at 199.) Plaintiff noted that she needed reminders to take her medication, could prepare simple meals, could not perform outdoor work, tired very easily, was plagued with chronic pain and needed long rest periods to complete simple tasks. (R. at 200.)

Plaintiff also indicated that she had difficulty walking on uneven ground, would go to doctor appointments, the store or the post office and could drive if she did not have "flare-ups." (R. at 201.) Plaintiff claimed that her interactions with friends and family were reduced immensely because of her MS and that the MS affected her lifting, walking, stair climbing, squatting, sitting, bending, kneeling, memory, standing, completing tasks and concentration. (R. at 203.) She also noted that she could pay attention for long periods of time and follow written and spoken instructions, but could not start what she finished. (R. at 203.) Finally, Plaintiff wrote that she could not handle stress or changes in routine well and she was afraid of losing her mobility. (R. at 204.)

In her pain questionnaire, Plaintiff indicated that she has an aching pain rated between a four and an eight that could hurt so much that she could not sit or stand for long periods of time. (R. at 195.) She noted that the pain started when she was diagnosed with MS, limited her activities and was relieved by rest and the chiropractor. (R. at 196.)

In November 2008, Plaintiff sent a letter to the Commissioner stating that she had major weakness in her right hip, leg and knee, as well as pain in her hips. (R. at 460.) She detailed her issues with standing from a sitting position, strength and balance, along with her inability to move quickly. (R. at 460.) She noted that she had fallen a few times because her right foot

12

occasionally dragged, which caused her to trip. (R. at 460.) Plaintiff indicated that she used a cane to help with balance and that she could not squat, lift or kneel. (R. at 460.)

At the hearing before the ALJ, Plaintiff discussed how she helped her son when he was ill. (R. at 31.) She indicated that she was not his caregiver, but would take her son to doctor's appointments or babysit his children, who were two and five, once or twice a week for one to two hours at a time. (R. at 31, 47.) Plaintiff testified that she had not had any surgeries or operations, but had chronic daily pain in her lower back, right hip and shoulders. (R. at 31-32.) Plaintiff believed that she could safely lift only ten pounds and stated that she could not hold her grandchildren. (R. at 33.)

Plaintiff told the ALJ that she could only stand for thirty to forty-five minutes before needing to sit and could only sit for about two hours before she became stiff. (R. at 33.) Plaintiff napped for an hour daily and performed light chores around the house. (R. at 35.) She testified that about half of her days were "lousy," when she could not get out of bed, felt weak, and was in pain. (R. at 45.) She also indicated that she fell and broke her rib in late 2008. (R. at 36.) While she testified that she took Tylenol for the pain, Plaintiff believed that it was her weakness, not the pain, that prevented her from leaving her house. (R. at 56.)

**F.    Plaintiff's Vocational Expert**

On September 30, 2009, Robert W. Lester, a vocational expert ("VE") opined on Plaintiff's employment ability. (R. 312-18.) Mr. Lester summarized Plaintiff's medical records, including her alleged activities of daily living and the medical opinions. (R. at 312-17.) He then noted Plaintiff's past relevant work as a receptionist and telephone operator and concluded that Plaintiff was disabled and unable to work in any capacity. (R. at 317.)

Mr. Lester relied heavily on Plaintiff's mental health evaluation that concluded that

Plaintiff would require supervision to complete work activities on a consistent basis. (R. at 317.)

He noted that Plaintiff's symptoms were exacerbated by stress and activity and that Plaintiff's

pain and medications interfered with her memory, attention, concentration and focus. (R. at 317-

18.) Additionally, Plaintiff would require frequent rests and three to four additional days off a

month. (R. at 318.) Mr. Lester opined that the significant accommodations necessary for

Plaintiff's employment would not be considered reasonable under the Americans with

Disabilities Act. (R. at 318.)

## II. PROCEDURAL HISTORY

Plaintiff protectively filed for DIB on February 7, 2008, claiming disability due to MS

with an alleged onset date of September 5, 2006, which was later amended to January 26, 2007.

(R. at 173, 139-43, 178-79.) The Social Security Administration ("SSA") denied Plaintiff's

claims initially and on reconsideration.[6] (R. at 91-99.) On October 2, 2009, Plaintiff testified

before an ALJ. (R. at 10.) On November 9, 2009, the ALJ issued a decision finding that

Plaintiff was not under a disability, as defined by the Act. (R. at 10-20.) The Appeals Council

subsequently denied Plaintiff's request to review the ALJ's decision on February 24, 2011,

making the ALJ's decision the final decision of the Commissioner subject to judicial review by

this Court. (*See* R. at 1-4.) On May 31, 2012, this Court *sua sponte* set the case for oral

argument, which occurred on June 8, 2012.

---

[6] Initial and reconsideration reviews in Virginia are performed by an agency of the state government — the Disability Determination Services ("DDS"), a division of the Virginia Department of Rehabilitative Services — under arrangement with the SSA. 20 C.F.R. pt. 404, subpt. Q; *see also* § 404.1503. Hearings before administrative law judges and subsequent proceedings are conducted by personnel of the federal SSA.

### III. QUESTIONS PRESENTED

Was the Commissioner's rejection of the opinion of Plaintiff's treating physician supported by substantial evidence on the record and the application of the correct legal standard?

Was the Commissioner's evaluation of Plaintiff's credibility supported by substantial evidence on the record and the application of the correct legal standard?

### IV. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. Jan. 5, 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). Substantial evidence is more than a scintilla, less than a preponderance, and is the kind of relevant evidence a reasonable mind could accept as adequate to support a conclusion. *Id.* (citations omitted); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

To determine whether substantial evidence exists, the Court is required to examine the record as a whole, but it may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (citation omitted) (internal quotation marks omitted); *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig*, 76 F.3d at 589). In considering the decision of the Commissioner based on the record as a whole, the Court must "take into account whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951) (internal quotation marks omitted)). The Commissioner's findings as to any fact, if the findings are supported by

15

substantial evidence, are conclusive and must be affirmed. *Hancock*, 667 F.3d at 476 (citation omitted). While the standard is high, if the ALJ's determination is not supported by substantial evidence on the record, or if the ALJ has made an error of law, the district court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520; *Mastro*, 270 F.3d at 177. The analysis is conducted for the Commissioner by the ALJ, and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied and whether the resulting decision of the Commissioner is supported by substantial evidence on the record. *See Mastro*, 270 F.3d at 176-77.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" ("SGA").[7] 20 C.F.R. §§ 416.920(b), 404.1520(b). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. *Id.* If the claimant establishes that she did not engage in SGA, the second step of the analysis requires her to prove that she has "a severe impairment . . . or combination of impairments which significantly limit[s] [her] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c). To qualify as a severe

---

[7] SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c).

impairment that entitles one to benefits under the Act, it must cause more than a minimal effect

on one's ability to function. 20 C.F.R. § 404.1520(c).

At the third step, if the claimant has an impairment that meets or equals an impairment

listed in 20 C.F.R. pt. 404, subpt. P, app. 1 (listing of impairments) and lasts, or is expected to

last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis

ends. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the impairment does not meet or equal a listed

impairment, then the evaluation proceeds to the fourth step in which the ALJ is required to

determine whether the claimant can return to her past relevant work[8] based on an assessment of

the claimant's residual functional capacity ("RFC")[9] and the "physical and mental demands of

work [the claimant] has done in the past." 20 C.F.R. §§ 416.920(e), 404.1520(e). If such work

can be performed, then benefits will not be awarded. *Id.* The burden of proof remains with the

claimant through step four of the analysis, such that she must prove that her limitations preclude

her from performing her past relevant work. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987);

*Hancock*, 667 F.3d at 472 (citation omitted).

However, if the claimant cannot perform her past work, the burden then shifts to the

Commissioner at the fifth step to show that, considering the claimant's age, education, work

experience and RFC, the claimant is capable of performing other work that is available in

---

[8] Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 416.965(a), 404.1565(a).

[9] RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.* (footnote omitted).

significant numbers in the national economy. 20 C.F.R. §§ 416.920(f), 404.1520(f); *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (citing *Bowen*, 482 U.S. at 146 n.5). The Commissioner can carry his burden in the final step with the testimony of a vocational expert ("VE"). When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents *all* of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.* If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 416.920(f)(1), 404.1520(f)(1).

## V. ANALYSIS

The ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since September 5, 2006. (R. at 12.) At step two, the ALJ determined that Plaintiff was severely impaired from MS, degenerative disc disease, obesity and depression. (R. at 12.) At step three, the ALJ concluded that Plaintiff's maladies did not meet one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1. (R. at 12-14.) More specifically, the ALJ determined that Plaintiff's MS did not result in a disorganization of motor function, visual or mental impairments, nor did it result in a significant, reproducible fatigue of motor function with muscle weakness from repetitive activity. (R. at 12-13.)

The ALJ then detailed Plaintiff's activities of daily living, indicating that Plaintiff had "no more than [a] mild restriction." (R. at 13.) Plaintiff reported that she was independent, able to bathe, groom and dress herself, prepare a simple meal, perform routine household chores,

drive a car and manage her money. (R. at 13.) The ALJ further noted that while Plaintiff "has [an] alleged inability to engage in more demanding activities, such limitation is allegedly based upon her physical impairments." (R. at 13.) The ALJ determined that Plaintiff had no more than mild difficulties in social situations, as she enjoyed communicating with her friends and family. (R. at 13.)

Next, the ALJ determined that Plaintiff had the RFC to perform sedentary work limited to unskilled or low semi-skilled tasks. (R. at 14.) The ALJ evaluated Plaintiff's credibility regarding her allegations that she suffered from weakness, chronic fatigue and pain, and that leg and muscle cramps affected her sleep. (R. at 14-15.) Plaintiff reported that her pain increased when she stood or sat for long periods of time, bent at the waist or lifted heavy objects. (R. at 15.) According to Plaintiff, she only took Ibuprofen for her pain; however, rest and chiropractic care ameliorated her pain. (R. at 15.) The ALJ noted that Plaintiff's written and oral statements concerning her ability to perform household tasks were contradicting. (R. at 15.) Plaintiff's impairments allegedly affected, among other things, her ability to lift, sit, stand, walk, climb stairs, remember information, complete tasks, handle stress and concentrate. (R. at 15.)

The ALJ determined that, while Plaintiff's impairments could cause her alleged symptoms, her "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent" with her RFC. (R. at 15.) The ALJ then summarized Plaintiff's medical evidence. (R. at 15-17.) A January 2007 MRI/CAT scan indicated no progression of Plaintiff's MS. (R. at 15.) A July 2008 MRI indicated general degenerative disc disease. (R. at 16.) By September 2008, Plaintiff ceased chiropractic care and had not been prescribed medications or undergone injections or surgeries for her back pain. (*See* R. at 16.)

The ALJ then summarized the medical records from Plaintiff's neurologist, Dr. John Hennessey. (R. at 16.) In May 2007, Plaintiff was prescribed Betaseron for her MS and Provogil for her fatigue. (R. at 16.) By September 2007, Plaintiff indicated that the Betaseron had made her better, and by March 2008, her condition had not changed, although Plaintiff had reported some balance issues. (R. at 16.) A June 2008 physical examination indicated mildly to moderately dulled bilateral Hoffman's, a dulled sensation to vibrations and an unsteady, cautious gait with stiffness. (R. at 16.) Plaintiff was put on steroids. (R. at 16.) One month later, Dr. Hennessey was pleased with Plaintiff's rate of improvement, noting that Plaintiff looked more upbeat and carefree, appearing like a different patient. (R. at 16.)

In March 2009, Plaintiff "was impressed by the fact that she had possibly had MS for many years and was still ambulatory and doing as well as she was." (R. at 16.) Dr. Hennessey noted dull sensation in Plaintiff's extremities and subtle limping on her right foot. (R. at 16-17.) In September 2009, Plaintiff had trouble with her gait, was limping on her right leg and was referred to a physical therapist. (R. at 17.)

In evaluating Plaintiff's credibility, the ALJ wrote that, while Plaintiff was "clearly dealing with fatigue and weakness related to her" MS, Plaintiff also reported that she was impressed by her ability to ambulate. (R. at 17-18.) While Plaintiff did limp, she reported daily activities of caring for herself, preparing her meals, cleaning, driving, using the computer and caring for her child and grandchildren. (R. at 18.) All of these abilities "serve[d] to further diminish the persuasiveness of [Plaintiff's] allegations." (R. at 18.) Because it was consistent with the entire medical record, the ALJ afforded the non-treating state agency physician opinion great probative weight. (R. at 18.)

The ALJ then reviewed the opinion letter of Dr. Hennessey in which he opined that Plaintiff could not perform any work due to her lack of balance. (R. at 18.) Dr. Hennessey wrote that Plaintiff could not walk more than a city block with her cane; was plagued with fatigue; could not focus or concentrate at work; would require frequent breaks during the day; and would miss three to four days a month at work. (R. at 18.) However, the ALJ accorded Dr. Hennessey's opinion little probative weight, stating that it was inconsistent with his treatment records, which did not reflect Plaintiff's inability to ambulate and, instead, reflected Plaintiff's ability to ambulate without a cane. (R. at 18.)

The ALJ then summarized the psychiatric opinion from Dr. Dougherty. (R. at 18-19.) The ALJ noted that Dr. Dougherty opined that Plaintiff "may need additional supervision to complete work activities" and would likely respond with stress by developing higher levels of depression and anxiety. (R. at 18-19.) He assigned Dr. Dougherty's opinion "significant probative weight." (R. at 19.) Although Mr. Lester's report was based primarily on Dr. Dougherty's opinion, the ALJ assigned his report no probative weight, because Mr. Lester improperly evaluated and weighed Plaintiff's medical evidence. (R. at 19.)

Determining that Plaintiff had the RFC to perform a limited range of sedentary work, the ALJ assessed at step four that Plaintiff was able to perform her past relevant work as a telephone operator. (R. at 19-20.) As a result, the ALJ concluded that Plaintiff was not under a disability, as defined by the Act. (R. at 20.)

Plaintiff asserts that the ALJ erred in determining that she was not disabled. (*See* Pl.'s Mem. at 24.) More specifically, Plaintiff complains that the ALJ used an inappropriate legal standard when evaluating Dr. Hennessey's opinion. (Pl.'s Mem. at 13-14.) Plaintiff also asserts that the ALJ's decision with respect to Dr. Hennessey's opinion was not supported by substantial

evidence. (Pl.'s Mem. at 14-21.) Finally, Plaintiff argues that the ALJ used an improper legal standard when evaluating Plaintiff's credibility. (Pl.'s Mem. at 21-24.) Defendant asserts that the ALJ gave little weight to Dr. Hennessey's opinion, because it was not supported by any of the medical evidence in the record. (*See* Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Mem.") at 14-15.) Defendant also argues that substantial evidence supported the ALJ's decision. (Def.'s Mem. at 13-16.)

**A.    Substantial evidence existed to support the ALJ's decision only through July 2008.**

Through July 2008, Plaintiff was responding well to her steroid and Betasone therapies. In her July 2008 visit, both Plaintiff and Dr. Hennessey appeared upbeat and optimistic about Plaintiff's condition. (R. at 391-92.) After July 2008, and especially by September 2009, Plaintiff's medical records indicate that her MS began to quickly deteriorate. Substantial evidence therefore only existed to support the ALJ's decision through July 2008.

**1.    Through July 2008, substantial evidence existed to support the ALJ's assignment of little probative weight to Dr. Hennessey's opinion.**

During the sequential analysis, when the ALJ determines whether the claimant has a medically-determinable severe impairment or combination of impairments which would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence resulting from consultative examinations or medical expert evaluations that have been ordered. *See* 20 C.F.R. § 416.912(f) (explaining the type of evidence needed for a DIB claim). When the record contains a number of different medical opinions, including those from the Plaintiff's treating physicians, consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence. *See* 20 C.F.R. § 416.927(c)(2) (discussing the weighing of conflicting evidence). If, however, the medical opinions are

inconsistent internally with each other or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. 20 C.F.R. §§ 416.927(c)(2), (d).

Under the applicable regulations and case law, a treating physician's opinion must be given controlling weight if: (1) it is well-supported by medically-acceptable clinical and laboratory diagnostic techniques and (2) is not inconsistent with other substantial evidence in the record. *Craig*, 76 F.3d at 590; 20 C.F.R. § 416.927(d)(2); SSR 96-2p. The regulations do not require that the ALJ accept opinions from a treating physician in every situation, *e.g.*, when the physician opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), when the physician's opinion is inconsistent with other evidence, or when it is not otherwise well supported. *Jarrells v. Barnhart*, No. 7:04-CV-00411, 2005 WL 1000255, at *4 (W.D. Va. Apr. 26, 2005); *see also* 20 C.F.R. §§ 404.1527(d)(3)-(4), (e).

Plaintiff complains that the ALJ evaluated Dr. Hennessey's opinion by deciding whether the opinion was supported by and not inconsistent with "'other pertinent clinical evidence,'" which Plaintiff claims is an improper legal standard. (Pl.'s Mem. at 13-14.) Instead, Plaintiff asserts that the ALJ should have evaluated the opinion based on substantial evidence. (Pl.'s Mem. at 14.) Plaintiff argues that by evaluating the "pertinent" evidence, the ALJ was able to pick and choose isolated facts. (Pl.'s Mem. at 14.)

While both *Craig* and Social Security Ruling 96-2p use the term "substantial evidence" to determine whether the treating physician's opinion is given controlling weight, the current regulations also uses the term "pertinent evidence." *See* 20 C.F.R. §§ 404.1527(d) &(d)(3) ("We will evaluate the degree to which these [medical] opinions consider all of the pertinent evidence

in your claim, including opinions of treating and other examining sources.). Pertinent evidence is evidence that has "a clear decisive relevance to the matter at hand." *See Merriam-Webster's Collegiate Dictionary* at 868 (10th Ed. 1998). Thus, it was not error for the ALJ to evaluate the medical evidence relevant to Dr. Hennessey's opinion. The ALJ's evaluation, however, must still be supported by substantial evidence.

Next, Plaintiff asserts that the ALJ attempted to "play doctor," which is contrary to the Fourth Circuit's decision in *Wilson v. Heckler*, 743 F.2d 218, 221 (4th Cir. 1984). (Pl.'s Mem. at 15.) More specifically, she takes umbrage with the ALJ's discussion of Dr. Hennessey's records: "'[Dr. Hennessey] noted that claimant's ability to ambulate without the use of a cane or any other assistance . . . with strength that was not *drastically diminished.*'" (Pl.'s Mem. at 15-16 (citing R. at 18).) Additionally, Plaintiff complains that the ALJ rejected Dr. Hennessey's opinion in total. (Pl.'s Mem. at 16-19.)

*Wilson* is inapposite here, because the ALJ in *Wilson* disregarded clinical findings of a treating physician. *Wilson*, 743 F.2d at 221. Here, the ALJ did not disregard Dr. Hennessey's diagnoses, but rather determined that substantial evidence did not support Dr. Hennessey's opinion with regard to his opinion of Plaintiff's ability to ambulate and her amount of strength. (*See* R. at 18.) Indeed, substantial evidence did support the ALJ's decision until July 2008. Dr. Hennessey's patient notes detailed Plaintiff's positive results from the Betaseron and steroid treatments. (*See* R. at 390-415.) In fact, Dr. Hennessey's July 2008 notes indicated the most favorable results from Plaintiff's medication regimen and observed that Plaintiff looked "like a different patient with her performance on her feet and her balance" without her cane. (*See* R. at 391.)

24

Since its decision in *Hunter v. Sullivan*, 993, F.2d 31 (4th Cir. 1992), the Fourth Circuit has consistently held that, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Mastro*, 270 F.3d at 178 (citing *Craig*, 76 F.3d at 590); *see also* 20 C.F.R. § 416.927(d)(2) (evaluating opinion evidence). Here, Dr. Hennessey's treatment notes through July 2008 indicated Plaintiff's progressively increasing strength and ability to ambulate as a result of her medication. He also observed an "upbeat" patient in Plaintiff. (*See* R. at 391.) Dr. Astruc, a non-treating physician who relied on Dr. Hennessey's records to provide a medical opinion, opined on September 5, 2008 that Plaintiff's RFC was sedentary work without any other restriction. (R. at 421-22.) Thus, through July 2008, substantial evidence exists in the record for the ALJ to assign little probative weight to Dr. Hennessey's entire opinion.

### 2. Substantial evidence exists to support the ALJ's credibility analysis through July 2008.

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 416.920(e)-(f), 416.945(a)(1). The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints. In evaluating a claimant's subjective symptoms, the ALJ must follow a two-step analysis. *Craig*, 76 F.3d at 594; *see also* SSR 96-7p (assessing the credibility of an individual's statements); 20 C.F.R. §§ 404.1529(a) & 416.929(a) (assessing symptoms, including pain). The first step is to determine whether there is an underlying medically determinable physical or mental impairment or impairments that reasonably could produce the individual's pain or other related symptoms. *Craig*, 76 F.3d at 594; SSR 96-7p, at 1-3. The ALJ must consider all the medical evidence in the record. *Craig*, 76 F.3d at 594-95; SSR 96-7p, at 5

25

n.3; *see also* SSR 96-8p, at 13 (specifically stating that the "RFC assessment must be based on *all* of the relevant evidence in the case record") (emphasis added).

If the underlying impairment reasonably could be expected to produce the individual's pain, then the second part of the analysis requires the ALJ to evaluate a claimant's statements about the intensity and persistence of the Plaintiff's impairments and the extent to which it affects the individual's ability to work. *Craig*, 76 F.3d at 595. The ALJ's evaluation must take into account "all the available evidence," including a credibility finding of the claimant's statements regarding the extent of the symptoms. The ALJ must provide specific reasons for the weight given to the individual's statements. *Craig*, 76 F.3d 595-96; SSR 96-7p, at 5-6, 11. This Court must give great deference to the ALJ's credibility determinations, unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" *Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997) (quoting *NLRB v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993)).

Plaintiff directs the Court to *Totten v. Califano*, 624 F.2d 10, 11 (4th Cir. 1980), for the proposition that the ALJ cannot discount her credibility based on her ability to perform "rudimentary" daily activities. (Pl.'s Mem. at 22-24.) While *Totten* does support the notion that a claimant does not have to be bedridden or totally helpless to qualify for disability, it also included undisputed facts of the claimant's long periods of incapacitation as a result of her medical impairments. *See Totten*, 624 F.2d at 12 ("The ALJ must consider this question and make specific findings on whether Totten's intermittent incapacity constitutes an inability to perform any substantial gainful activity.").

Here, treatment notes from Dr. Hennessey through July 2008 indicate Plaintiff's positive response to medication, which included Plaintiff's ability to ambulate and gain strength. (*See* R.

at 391.) In September 2008, Plaintiff also indicated her abilities to perform simple household chores, drive and take care of her grandchildren. (*See* R. at 198-205.) Substantial evidence existed through July 2008 to support the ALJ's determination that Plaintiff was not credible with respect to her claim of disability, as her activities of daily living were consistent with the objective medical evidence that indicated Plaintiff's improvement and ability to ambulate effectively.

**B.     Remand is required for consideration of an effective offset date after July 2008.**

While substantial evidence existed to support the ALJ's decision through July 2008, the ALJ's decision is not supported by substantial evidence past July 2008. The reason is simple. MS is a deteriorating disease and the evidence indicates that Plaintiff's condition began to significantly deteriorate after July 2008. Certainly, by September 2009, Plaintiff's MS rose to the level of disabling under the Act. Because the ALJ failed to fully explain his decision after July 2008, substantial evidence did not exist to support his decision. Therefore, this case must be remanded for consideration of an effective onset date after July 2008.

**1.     After July 2008, substantial evidence did not exist to support the ALJ's decision.**

After July 2008 it appears that Plaintiff's condition deteriorated. The medical records and opinions of Dr. Dougherty and Dr. Hennessey, both of whom treated Plaintiff in person after July 2008, indicated that Plaintiff's RFC should have been lower than sedentary. Mr. Lester, whose opinion was based primarily on Dr. Dougherty's records, agreed.

On December 30, 2008, Dr. Dougherty met with Plaintiff, and assessed that while Plaintiff could attend and complete a normal workday, she might need additional supervision to consistently complete work activities. (R. at 462, 469.) Dr. Dougherty also opined that Plaintiff

would probably experience increased levels of depression and anxiety dealing with the stress of the workplace. (R. at 469.)

In formulating her opinion, Dr. Dougherty determined that Plaintiff "was a credible claimant." (R. at 468.) The ALJ assigned "significant probative weight" to Dr. Dougherty's opinion, because Dr. Dougherty met with Plaintiff in person and her opinion was based on observation. (R. at 19.) Mr. Lester, who relied heavily on Dr. Dougherty's opinion, opined that Plaintiff would require frequent rests and three to four additional days off a month. (R. at 318.)

In March 2009, Dr. Hennessey noted that Plaintiff had an academic visit and observed extreme spasticity on Plaintiff's right side and Plaintiff's cautious gait. (R. at 483-84.) Certainly by September 2009, when Dr. Hennessey's patient notes indicated Plaintiff's poor response to her medications and recommended that Plaintiff visit a physical therapist, Plaintiff's MS had become substantially worse. (*See* R. at 479-80.)

"Judicial review of an administrative decision is impossible without an adequate explanation of that decision by the" ALJ. *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983). While written evaluation of every piece of evidence is not required to support the decision of an ALJ in every case, the ALJ must articulate at some minimal level his analysis of the evidence in cases in which considerable evidence is presented to support a plaintiff's position. *Orlando v. Heckler*, 776 F.2d 209, 213 (7th Cir. 1985). The lack of even minimal analysis or articulation of the basis for the ALJ's conclusions makes this Court's task cumbersome. Therefore, lopsided analysis on the part of the ALJ merits little deference. *See Hines v. Barnhart*, 453 F.3d 559, 566 (4th Cir. 2006) ("The deference accorded an ALJ's findings of fact does not mean that we credit even those findings contradicted by undisputed evidence.").

When he discounted Dr. Hennessey's September 2009 opinion, the ALJ was required to provide "good reasons" for doing so. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007). As the Sixth Circuit explained in *Rogers*:

> Because of the significance of the notice requirement in ensuring that each denied clamant receives fair process, a failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.

*Rogers*, 486 F.3d at 243.

While the ALJ properly explained his decision and substantial evidence existed in the record to support his findings through July 2008, the ALJ fails to explain the disparities of Dr. Hennessey's medical records after July 2008. Doing so was error, especially because the evidence suggested that Plaintiff was struggling with her MS. Consequently, Dr. Hennessey's September 2009 opinion should have been assigned controlling weight after July 2008, as it was well-supported by Dr. Hennessey's patient notes after July 2008 and consistent with Dr. Dougherty's psychiatric opinion.

Although the ALJ noted in his decision Plaintiff's fatigue and weakness, he based his credibility finding on Plaintiff's self-reporting of how impressed she was with her ability to ambulate, despite having a diagnosis of MS. (*See* R. at 18.) The ALJ's evaluation of Plaintiff's credibility was also based on the objective medical evidence of Plaintiff's ability to ambulate and gain strength (*see* R. at 17), but this evidence was taken from medical records in or before July 2008. Similarly, the ALJ noted Plaintiff's contradictory statements concerning her activities of daily living without adequately addressing the fact that MS is a deteriorating disease. As discussed above, except for the non-treating physician whose opinion was based on medical records before July 2008, the medical records and opinions of Plaintiff's ability to work dated

29

after July 2008 all indicate Plaintiff's MS was deteriorating quickly and to a point that would make her disabled under the Act. Because the ALJ did not adequately explain his decision after July 2008 — despite his duty do to so — substantial evidence cannot exist to support that decision.

      2.      **Based on the substantial evidence in the record, the ALJ should have determined whether an effective onset date exists; a remand is therefore necessary to determine Plaintiff's effective onset date.**

While substantial evidence did not exist to support the ALJ's decision in total, this Court cannot award benefits to Plaintiff after July 2008, because "evidence of Plaintiff's onset is ambiguous." *Baily v. Chater*, 68 F.3d 75, 79 (4th Cir. 1995). In cases such as Plaintiff's, this Court must remand the case to have the ALJ "procure the assistance of a medical advisor in order to render the informed judgment that the Ruling requires." *Id.* (citations omitted); *see also* SSR 83-20 ("At the hearing, the [ALJ] should call on the services of a medical advisor when onset must be inferred.").

While substantial evidence did not exist to support a finding that Plaintiff was disabled under the act before July 2008, evidence indicated that by September 2009, Plaintiff's MS had deteriorated to a point where she was disabled. Deciding when Plaintiff became disabled, however, should be left to the ALJ, not this Court, and requires an explanation by that ALJ as to the substantial evidence that supported the finding. Because the ALJ failed to address the deteriorating nature of Plaintiff's disease, as demonstrated in her medical records, this Court recommends a reversal and remand of this case for a hearing to consider Plaintiff's effective onset date.

## VI.  CONCLUSION

Based on the foregoing analysis, it is the recommendation of this Court that Plaintiff's motion for summary judgment and motion to remand (ECF No. 7) be GRANTED; that Defendant's motion for summary judgment (ECF No. 9) be DENIED; and, that the final decision of the Commissioner be REVERSED and REMANDED for a consideration of an effective onset date.

Let the Clerk forward a copy of this Report and Recommendation to the Honorable Henry E. Hudson and to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a *de novo* review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

/s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Dated:  June 22, 2012